(December 14, 2017)

■ EMIGRANT BANK, as Successor by Merger with EMIGRANT SAVINGS BANK-MANHATTAN, Respondent, v LUIGI ROSABIANCA et al., Defendants, and CARMELO ROSABIANCA et al., Appellants. [67 NYS3d 175]—

Order, Supreme Court, New York County (Gerald Lebovits, J.), entered June 17, 2016, which denied the motion of defendants Carmelo and Vivian Rosabianca (the Rosabiancas), inter alia, to file a late answer pursuant to CPLR 3012 (d), affirmed, without costs.

Notwithstanding the Rosabiancas' sympathetic position, we conclude that the denial of their motion for relief under CPLR 3012 (d) was warranted for the reasons that follow.

I. Factual and Procedural Background

Since 1974, the Rosabiancas have owned and lived at the residential property located at 2342 Benson Avenue in Brook-

lyn. Allegedly without their knowledge, in 2008, the Rosabiancas' son, defendant Luigi Rosabianca (Luigi),[1] used their home as collateral for a $1.76 million mortgage loan he obtained from Emigrant Mortgage Company (EMC) on a condominium unit located at 55 Wall Street in Manhattan. EMC subsequently assigned the collateral mortgage and related note to Emigrant Savings Bank-Manhattan (ESBM), which was later merged into plaintiff, Emigrant Bank.

On April 30, 2008, shortly before Luigi's purchase of the condominium, the Rosabiancas each granted Luigi a durable general statutory short form power of attorney, appointing Luigi to act as their attorney-in-fact for all matters listed on the instruments, including "real estate transactions" and "banking transactions" with respect to their Brooklyn home. The Rosabiancas' signatures on both powers of attorney were duly acknowledged by a licensed notary public. Both powers of attorney have a handwritten notation at the bottom stating, "2342 Benson Ave., Brooklyn[,] NY Block 6874[,] Lot 50."

At the May 14, 2008 closing on the condominium unit, Luigi acted as borrower, attorney-in-fact for the Rosabiancas, title closer, and title agent for Fidelity Title Insurance Company. Also at the closing that day, Luigi executed both the collateral mortgage and an adjustable rate note referring to a "Mortgage/Lien in the amount of $1,760,000" to be placed on two properties, setting forth the addresses of the Manhattan condominium unit and the Rosabiancas' Brooklyn home. Luigi signed the collateral mortgage on the Rosabiancas' behalf as their attorney-in-fact. Luigi also provided an affidavit of effectiveness, sworn and subscribed before a licensed notary public[2] with respect to each of the powers of attorney, in which he swore that each power of attorney was a "valid and subsisting

---

**1.** Luigi was suspended from the practice of law on March 12, 2015. He was indicted for stealing $4.4 million from clients and pleaded guilty to multiple counts of grand larceny, and was sentenced to 4 to 12 years' imprisonment subsequent to the events here at issue. He has since been disbarred.

**2.** Although both affidavits state that Luigi swore and subscribed them before notary public David Ross Koshers on the "14th day of May, 2007[,]" the collateral mortgage, which was signed by Luigi as attorney-in-fact for both of the Rosabiancas, reflects that "[o]n the 14th day of May 2008" before the same notary public, Luigi "acknowledged . . . that . . . he . . . executed the same in his . . . capacity . . . and that by his . . . [signatures] on the instrument, the [individuals] or the person upon behalf of which the [individuals] acted, executed the instrument." The 2007 date on the affidavits of effectiveness was evidently a typographical error, which, under the circumstances, was cured by the recitation of the correct date on the collateral mortgage.

[p]ower which has not been revoked" and that he had "full and unqualified authority to execute all documents." Luigi alleges that, subsequent to the closing, he was unable to locate the original powers of attorney and collateral mortgage, and for that reason never recorded them.

Luigi allegedly made the collateral mortgage loan payments for more than three years until defaulting on the loan by failing to make the mortgage payment due August 1, 2011. One week later, on August 8, 2011, he obtained a $500,000 loan from a Panamanian lender, Little Bay Investment Corp. (Little Bay), which was secured by a mortgage on the Wall Street condominium. On September 1, 2011, that mortgage was recorded in the Office of the New York City Register.

On April 18, 2012, the Rosabiancas were each served a copy of a summons and complaint in an action brought by ESBM for an order directing the Office of the New York City Register, Kings County, to accept for recording copies of the powers of attorney signed by the Rosabiancas and the collateral mortgage, because the original documents were lost (*Emigrant Sav. Bank v Rosabianca*, Sup Ct, Kings County, 2012, index No. 6591/12 [the Kings County action]). The first page of the complaint refers to the "Collateral Mortgage in the original principal sum of $1,760,000.00 dated May 14, 2008," and states that the powers of attorney were "given by Defendants Carmelo Rosabianca and Vivian Rosabianca to Luigi Rosabianca to act as their Attorney in Fact *with respect to the granting of a collateral mortgage in favor of [EMC] on the premises known as 2342 Benson Avenue, Brooklyn, New York 11214*" (emphasis added).

On September 7, 2012, after the Rosabiancas failed to appear in the Kings County action, ESBM moved for a default judgment directing that the copies of the powers of attorney and collateral mortgage be recorded and to quiet title in its favor. On November 19, 2012, Supreme Court, Kings County, granted the motion and issued an order of default. On January 29, 2013, the Rosabiancas were each served with a notice of entry of the order of default.

On June 21, 2013, Supreme Court, Kings County, entered a judgment directing that the copies of the powers of attorney and collateral mortgage be recorded in the Office of the City Register, Kings County. On August 13, 2013, a notice of entry of judgment was served on each of the Rosabiancas with a copy of the judgment attached. The judgment describes the "Collateral Mortgage" as a "mortgage in the original principal sum of $1,760,000.00 dated May 14, 2008," and as "given by Defend-

ants Carmelo Rosabianca and Vivian Rosabianca to Luigi Rosabianca in favor of [EMC], on the Property." The address of the "Property" appearing on the judgment is "2342 Benson Avenue, Brooklyn, New York 11214."

On September 6, 2013, the copies of the powers of attorney and collateral mortgage were recorded at the Office of the City Register, Kings County, by EMC.

On November 19, 2013, EMC served a 90-day notice of default on the Rosabiancas pursuant to RPAPL 1304. The notice of default stated that the Rosabiancas were 841 days in default on the collateral mortgage and were at risk of losing their home.

In February 2014, Little Bay assigned its mortgage on the Wall Street condominium to Secured Lending Corp.

On March 26, 2014, plaintiff filed a summons and complaint in the instant action to foreclose on both the Rosabiancas' home and Luigi's condominium unit, naming the Rosabiancas, Luigi and Secured Lending as defendants. The Rosabiancas were served with copies of the summons and complaint by delivery to a person of suitable age and discretion at their place of residence on April 11, 2014, followed by delivery of copies of the summons and complaint to the Rosabiancas at their home address via first class mail on April 17, 2014 (see CPLR 308 [2]). The affidavits of service as to both of the Rosabiancas were e-filed in the Office of the New York County Clerk on April 28, 2014.

The Rosabiancas now allege that it was only upon their receipt of the copies of the summons and complaint in this action that they became aware of the existence of the collateral mortgage. They also aver that, after they were served with the summons and complaint, Luigi assured them that he would "do everything in his power" to prevent foreclosure on their home.

On May 28, 2014, the Rosabiancas' time to answer the summons and complaint expired, without the Rosabiancas having appeared in the action.

On June 9, 2014, plaintiff served the Rosabiancas with notices of default pursuant to CPLR 3215 (g) (3) (i) by first class mail.

On August 20, 2014, Luigi appeared at a mandatory foreclosure settlement conference, where he admitted the default and indicated that he intended to reinstate the loan from plaintiff and to settle with Secured Lending on its mortgage against the condominium unit, which, although obtained subsequently, had

been recorded prior to the recording of plaintiff's mortgage. The settlement conference was adjourned to October 20, 2014, to afford Luigi time to prepare and submit a settlement proposal. However, Luigi failed to appear for the adjourned settlement conference. On December 12, 2014, plaintiff moved for a default judgment of foreclosure.

Subsequently, the Rosabiancas retained counsel. Rather than opposing plaintiff's motion for a default judgment, however, they moved, on April 23, 2015, as relevant on appeal, for leave to file a late answer. On June 16, 2016, following oral argument, Supreme Court denied the motion.

On appeal, the Rosabiancas argue that Supreme Court should have granted their motion to file a late answer because Luigi used their home as collateral for the mortgage without their knowledge or consent. They also claim that their lack of awareness of the collateral mortgage and their reliance on their son to protect their home from foreclosure once they became aware of the mortgage constitute an excusable default and a meritorious defense. In addition, they argue that the powers of attorney used by Luigi to obtain the collateral mortgage on their home were deficient because their signatures were obtained on those documents without their knowledge of the documents' true nature and contents.

In response, plaintiff maintains that the Rosabiancas' default was not excusable because the Rosabiancas could have hired counsel other than Luigi when they first became aware of the collateral mortgage. Plaintiff further contends that the Rosabiancas have no meritorious defense because they each executed a valid power of attorney authorizing Luigi to act as their attorney-in-fact.

II. Discussion

Under CPLR 3012 (d), a trial court has the discretionary power to extend the time to plead, or to compel acceptance of an untimely pleading "upon such terms as may be just," provided that there is a showing of a reasonable excuse for the delay. In reviewing a discretionary determination, the proper inquiry is whether the court providently exercised its discretion.

In *Artcorp Inc. v Citirich Realty Corp.* (140 AD3d 417 [1st Dept 2016]), we adopted the factors set forth in *Guzetti v City of New York* (32 AD3d 234, 238 [1st Dept 2006, McGuire, J., concurring]) as those that "must . . . be considered and balanced" in determining whether a CPLR 3012 (d) ruling constitutes an abuse of discretion. Those factors include the length of the delay, the excuse offered, the extent to which the delay was

willful, the possibility of prejudice to adverse parties, and the potential merits of any defense (32 AD3d at 238).

In this case, with respect to the first *Artcorp/Guzetti* factor, the length of the delay, the Rosabiancas were served with copies of the summons and complaint in this action showing that plaintiff sought foreclosure on both Luigi's Manhattan condominium unit and the Rosabiancas' Brooklyn home, in April 2014. The Rosabiancas made their motion on April 16, 2015. Thus, the length of the delay in their response to the summons and complaint was approximately one year. This factor tends to support denial of their motion, especially when viewed in light of their prior notices of the mortgage at least by April 2012 and of the default by November 2013.

Regarding the second *Artcorp/Guzetti* factor, the excuse offered for the delay, the Rosabiancas aver that they reasonably relied on their son's representation that he would "do everything in his power" to prevent foreclosure on their home, which they understood to mean that he would appear in court on their behalf and defend them. Although the circumstances afford a sympathetic view of the Rosabiancas, the merit of their position is questionable, given that they can point to no action taken by Luigi on their behalf following service of the summons and complaint upon them. We treat this factor as neutral, tending neither to favor nor to disfavor denial of the Rosabiancas' motion.

With respect to the third *Artcorp/Guzetti* factor, the absence or presence of willfulness, the Rosabiancas maintain that they first learned that the collateral mortgage had been placed on their home in April 2014, when they were served with the summons and complaint in this action. As the record shows, however, the Rosabiancas were served with the complaint in the Kings County action on April 18, 2012. That complaint showed that ESBM sought to record both powers of attorney signed by the Rosabiancas and contemporaneously record the original collateral mortgage on their Brooklyn home. By no later than August 13, 2013, when they were served with the notice of entry of the default judgment in the Kings County action, the Rosabiancas had been informed that the copies of the powers of attorney and the collateral mortgage on their home would be recorded. Thus, at the time that Carmelo Rosabianca stated, in his April 14, 2015 affidavit in support of the Rosabiancas' motion, that he had no knowledge that a mortgage had been placed on his home before the commencement of this action, the Rosabiancas were almost certainly knowing participants in the transaction, as they were aware of both the

mortgage and its function of enabling Luigi to finance the purchase of the condominium unit using the equity in their home. This factor tends to support denial of the motion.

Concerning the fourth *Artcorp/Guzetti* factor, the possibility of prejudice to an adverse party, plaintiff's argument as to the prejudice it would suffer due to the delay in recouping its interest in the property is substantially neutralized by its delay in pursuing its legal remedies. This factor tends neither to favor nor to disfavor denial of the motion.

Regarding the fifth *Artcorp/Guzetti* factor, whether the Rosabiancas have a meritorious defense, Supreme Court was correct in observing that it is not a defense for the Rosabiancas to state that they were cheated by their son. Moreover, the powers of attorney signed by the Rosabiancas expressly granted Luigi full powers to act on their behalf with respect to real estate, banking and loan transactions relating to their home. In addition, EMC secured from Luigi affidavits of effectiveness attesting to the validity of the powers of attorney and that Luigi had "full and unqualified authority to execute all documents" on behalf of the Rosabiancas. The affidavits of effectiveness demonstrate that the powers of attorney granted Luigi not only apparent, but also express, authority to act on the Rosabiancas' behalf as their attorney-in-fact. Thus, there is no merit in the Rosabiancas' argument that the powers of attorney were fraudulently obtained.

Neither is it a defense in the foreclosure action that Luigi apparently committed fraud in carrying out his duties under the powers of attorney. "[A] principal may be held liable in tort for the misuse by its agent of his apparent authority to defraud a third party who reasonably relies on the appearance of authority, even if the agent commits the fraud solely for his personal benefit, and to the detriment of the principal" (*Parlato v Equitable Life Assur. Socy. of U.S.*, 299 AD2d 108, 113 [1st Dept 2002], *lv denied* 99 NY2d 508 [2003]). Because the record amply demonstrates the lack of any meritorious defense, this factor weighs strongly in favor of denial of the motion.

Of these five factors, three—the lack of a potential meritorious defense, which is the most notable, the length of the delay, and the willfulness of the default—weigh against granting the motion. The remaining factors, whether the delay was excusable and whether there was any possibility of prejudice to an adverse party, are arguably neutral. Therefore, considering and weighing the five *Artcorp/Guzzetti* factors, we conclude that Supreme Court properly denied the Rosabiancas' motion.

The dissent advances several arguments for its differing

view, most of them not raised by the Rosabiancas and requiring rejection for that reason alone. Moreover, these arguments are contrary to the well-settled statutory scheme regarding short form powers of attorney and its underlying policy considerations.

First, the dissent's view is that the limiting language of the powers of attorney prohibited Luigi from exercising any of the broad general powers enumerated in those instruments except in relation to the refinancing of the Rosabiancas' residence. This argument was not advanced by the Rosabiancas before either Supreme Court or this Court, and cannot serve as a basis for finding that the motion should have been granted.

Similarly never raised by the Rosabiancas is the dissent's argument that EMC was obligated to refuse Luigi's exercise of authority over his parents' home because of language in the powers of attorney purportedly limiting his authority solely to refinancing that property. Moreover, there is no support in law for the notion that, when presented with statutory short form powers of attorney in conjunction with mortgages, a third party, such as EMC here, is required to look beyond their facial validity and interpret their language to ensure that the named attorney-in-fact is not acting outside the scope of the authority granted. Rather, because the statutory short form powers of attorney used by Luigi had been recently executed and were in all respects facially valid at the time of the closing, EMC was entitled to rely on them (*Oliveto Holdings, Inc. v Rattenni*, 110 AD3d 969, 971 [2d Dept 2013]).

In fact, examination of the statutory scheme respecting powers of attorney makes clear that the dissent's position is contrary to the law. The statutory short form power of attorney was created by the Legislature in 1948 to assure that the grant of authority given by a principal to an agent would not be thwarted by a third party's unreasonable refusal to accept the power of attorney (Rose Mary Bailly & Barbara S. Hancock, Practice Commentaries, McKinney's Cons Laws of NY, Book 23A, General Obligations Law § 5-1504 at 155). Until that time, refusal by financial institutions to accept general powers of attorney had been a common occurrence (*id.*). As a result, the Legislature enacted General Obligations Law § 5-1504, which bars lenders and others doing business in New York from refusing, without reasonable cause, to honor a statutory short form power of attorney that has been properly executed. A bank is entitled, under the statute, to accept and rely on a properly executed power of attorney in the absence of actual knowledge that the principal lacked capacity to subscribe it or

was subject to fraud, duress or undue influence in executing it, unless the bank has actual notice that the instrument has been terminated or revoked (General Obligations Law § 5-1504; *see Oliveto Holdings*, 110 AD3d at 971).

The statutory short form powers of attorney granted to Luigi were properly executed, and there is no claim that EMC possessed actual knowledge of any of the specified grounds for their rescission. Moreover, as noted, at the closing, Luigi furnished affidavits of effectiveness attesting to his authority to act on behalf of his parents in the transaction. Indeed, the Rosabiancas have not challenged the overall validity of the powers of attorney, nor have they questioned EMC's legal duty to honor them.

Thus, EMC reasonably relied on Luigi's actual authority to bind his parents to the collateral mortgage, as set forth in his contemporaneous sworn statements. The bank was statutorily bound to honor the documents presented to it, as it had no reasonable cause not to do so.

Next, the dissent argues that the Rosabiancas have a meritorious defense, i.e., that the complaint fails to state a cause of action. In the dissent's view, the collateral mortgage secures a nonexistent note, since no note was signed by either of the Rosabiancas as "borrower." Again, this argument was not advanced before either Supreme Court or this Court, and must be rejected for that reason alone. Furthermore, it is an argument that emphasizes form over substance. The collateral mortgage, signed by Luigi as attorney-in-fact for each of the Rosabiancas, was clearly intended to secure the Rosabiancas' home and to refer to the adjustable rate note signed by Luigi the same day. Moreover, both the note and the mortgage set forth the address of the Rosabiancas' home in Brooklyn and $1,760,000 as the amount of principal to be paid to the lender.

Relying upon *Ford v Unity Hosp.* (32 NY2d 464, 472-473 [1973]), the dissent further argues that because Luigi lacked any express authority to enter into the loan transaction, but relied on apparent authority to justify his actions, EMC had a duty to determine the extent of his authority. Once again, this argument must be rejected because it was not raised before either Supreme Court or this Court. Furthermore, as indicated, Luigi's express authority to engage in the transaction was demonstrated at the closing. In any case, even were we to find that Luigi demonstrated only apparent authority to act for his parents, *Ford* is both inapposite and distinguishable. In *Ford*, the Court of Appeals found that the unauthorized act of a foreign agent for a Mexican insurance company in delivering

into this State a cover letter for a policy of malpractice insurance, which was both beyond the scope and in direct contravention of its agency agreement, did not sufficiently comply with standards of due process to subject its principal to the jurisdiction of New York courts pursuant to former section 59-a of the Insurance Law. It was conceded that the entity in question was unauthorized to deliver the letter regarding the issuance of the insurance policy, and, in fact, had been directed not to do so. The common-law rule there invoked, that "[o]ne who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority" (32 NY2d at 472), upon which the dissent relies, is not at issue here, where the applicable principles regarding powers of attorney have been statutorily codified and supplant the general common-law doctrine.

Under the principles applicable in this case, as set forth in General Obligations Law §§ 5-1502A and 1504 and in currently prevailing case law, lenders without actual knowledge to the contrary are required to rely on facially valid and, at the time of closing, unrevoked, statutory short form powers of attorney where "the circumstances surrounding [their] presentation would not . . . put a reasonable person on notice that something was amiss" (*see Oliveto Holdings*, 110 AD3d at 971 [internal quotation marks omitted]). These principles govern the duties of lenders in real estate mortgage loan transactions involving statutory short form powers of attorney, such as EMC in this case. Thus, the general common-law principles set forth in *Ford v Unity Hosp.*, which govern the duties of third parties to investigate the extent of the authority of agents in circumstances other than real estate transactions involving statutory short form powers of attorney, are inapplicable in this case.

Finally, the dissent contends that although powers of attorney bar attorneys-in-fact from making gifts, including to themselves, exceeding $10,000, Luigi essentially made a gift to himself of all of the equity in his parents' home, violating his statutory duty to act in the best interests of his principals (*see* General Obligations Law § 5-1514 [former General Obligations Law § 5-1502]). Again, this argument was not advanced before either Supreme Court or this Court and, accordingly, we reject it.

We have considered the Rosabiancas' remaining contentions and find them unavailing. Concur—Friedman, J.P., Gische, Kapnick and Kahn, JJ.

Gesmer, J., dissents in a memorandum as follows: The record before us supports a finding that defendants Carmelo and

Vivian Rosabianca should have been granted permission to interpose a late answer, upon consideration of every applicable factor. Most notably, the motion court failed to consider "the strong public policy in favor of resolving cases on the merits," which we have held normally weighs in favor of granting such motions (*Artcorp Inc. v Citirich Realty Corp.*, 140 AD3d 417, 418 [1st Dept 2016]). That is particularly appropriate here, where the movants demonstrated, although "not essential" on this prejudgment request to file a late answer, that they have at least two meritorious defenses to this foreclosure proceeding (*id.* at 418, quoting *Jones v 414 Equities LLC*, 57 AD3d 65, 81 [1st Dept 2008]; *see also* CPLR 3012 [d]; *Hirsch v New York City Dept. of Educ.*, 105 AD3d 522 [1st Dept 2013]). First, in accepting the mortgage executed by Luigi Rosabianca on his parents' home, plaintiff's predecessor improperly relied on powers of attorney that did not give Luigi Rosabianca actual authority, or necessarily apparent authority, to mortgage his parents' home. In addition, plaintiff fails to state a cause of action to foreclose the mortgage signed in the names of Carmelo and Vivian Rosabianca, because the mortgage states that it secures a note signed by them, but plaintiff bases its foreclosure action only on a note signed by their son, and no note signed by the senior Rosabiancas has been produced.

Since, as the majority concedes, there would be no prejudice to plaintiff due to delay in permitting Mr. and Mrs. Rosabianca to file a late answer, the factors of delay and prejudice weigh in favor of granting the motion. Their reasonable excuse, and evidence of the lack of willfulness in their delay, as discussed more fully below, arise from their reasonable reliance on the representation by their lawyer son, defendant Luigi Rosabianca, that he would appear on their behalf in this action. Because, in my view, all of the applicable factors favor granting leave to file a late answer, I respectfully dissent.

Facts

Carmelo and Vivian Rosabianca are elderly Italian immigrants. Mr. Rosabianca worked for 40 years as a mechanic.

Luigi Rosabianca is the senior Rosabiancas' son. He was admitted to the practice of law in 2000, and developed a highly visible law firm specializing in real estate. In March 2015, he was suspended from the practice of law for mishandling and misappropriating IOLA funds (*Matter of Rosabianca*, 127 AD3d 142 [1st Dept 2015]). He was disbarred in July 2015 for continuing to practice law during his suspension (*Matter of Rosabianca*, 131 AD3d 215 [1st Dept 2015]). He was indicted in October 2015 on charges that he stole $4.5 million from clients.

In 1974, the senior Rosabiancas purchased a home at 2342 Benson Avenue in Brooklyn (the Brooklyn residence) along with another married couple, the Modicas. The senior Rosabiancas have lived in the Brooklyn residence ever since. By bargain and sale deed executed on April 15, 2008, and recorded on May 21, 2008, the Modicas conveyed their interest in the Brooklyn residence to the senior Rosabiancas. Before the events at issue here occurred, the senior Rosabiancas paid off their mortgage in full.

On or about April 30, 2008, the senior Rosabiancas executed powers of attorney that contain the following limiting language in bold type, above the parties' signatures: "This power of attorney is created for the express, limited purpose of authorizing and empowering the agent to do any and all acts connected with the refinance of the residential property known as 2342 Benson Avenue."

Two weeks later, on May 14, 2008, Luigi Rosabianca purchased condominium unit 540 at 55 Wall Street in Manhattan. In order to do so, he borrowed $1,760,000 from Emigrant Mortgage Company, Inc. (EMC) and signed a note dated May 14, 2008 (the Note). The Note was secured by a mortgage executed by Luigi Rosabianca and dated May 14, 2008 (the Mortgage), which purports to encumber both the Condominium and the Brooklyn residence.[1] Luigi did not sign the Mortgage as attorney-in-fact for his parents, but only in his own capacity as the sole "Borrower" identified in the Mortgage. The Mortgage also recites that "[the Borrower] lawfully own[s]" the property encumbered by the Mortgage, although there is no evidence that Luigi ever owned the Brooklyn residence.

On the same date, Luigi, purporting to act as attorney-in-fact for his parents under the powers of attorney, executed a "Collateral Mortgage" on his parents' residence (the Collateral Mortgage). The Collateral Mortgage defines the "Borrower" as Carmelo and Vivian Rosabianca, and recites that the senior Rosabiancas signed a note on May 14, 2008 that shows that they owe $1,760,000 to EMC and that the Collateral Mortgage

---

1. The Mortgage states that the Borrower gives the Lender "rights in the Property . . . which is located at 55 WALL STREET APT 540 New York, New York 10005-2823. This property is in KINGS County. It has the following legal description: See Schedule 'A' attached hereto and made a part hereof. These premises are improved by a 1-4 family dwelling only. Further collateralized by: 2342 Benson Avenue, Brooklyn, NY 11214" (bracketed material omitted). "Schedule A" contains property descriptions for both the Condominium and the Brooklyn residence. The attached Adjustable Rate Rider, 1-4 Family Rider and Interest Only Payment Rider refer only to the Condominium.

secures that note. The record does not contain a note executed by Carmelo and Vivian Rosabianca, either directly or by power of attorney, and no one has claimed that such a note exists.

At the closing, Luigi acted as borrower, attorney-in-fact for his parents, title closer, and title agent for Fidelity Title Insurance Company. It is undisputed that the senior Rosabiancas' home was not encumbered by a mortgage at the time of the closing, and there is no claim that the Collateral Mortgage constituted a refinance of that property. Neither Carmelo Rosabianca nor Vivian Rosabianca authorized Luigi to use their home as collateral for the purchase of the Condominium or to represent that they had borrowed $1,760,000 from EMC, and they did not know at that time that he had done so, or that he had represented himself to be their attorney-in-fact at the closing. Luigi never recorded the mortgages or powers of attorney.[2]

On or about October 30, 2009, EMC assigned the Note and the Mortgage to Emigrant Savings Bank-Manhattan (ESBM).[3] On December 31, 2012, ESBM merged with and into plaintiff Emigrant.

Luigi Rosabianca made mortgage payments until in or about August 2011. On or about March 17, 2014, Emigrant commenced this foreclosure action against Luigi and the senior Rosabiancas, claiming that Luigi was in default on the Note he had signed. In the first cause of action, Emigrant seeks to foreclose only on the Condominium on the basis of the Mortgage. In the third cause of action, Emigrant seeks to rely on the Collateral Mortgage to foreclose on the Brooklyn residence. The complaint contains no allegations that the senior Rosabiancas signed any note.

When the senior Rosabiancas learned of this action, Luigi assured them that "he would do everything in his power to prevent [their] home from being foreclosed upon." Notwithstanding that, he failed to file an answer on their behalf, or on

---

**2.** In 2012, plaintiff brought an action in Kings County in which it sought to record copies of the powers of attorney and the Collateral Mortgage. The senior Rosabiancas did not appear. The majority suggests that their failure to appear in that action shows that their delay in filing an answer in this case was willful. However, their default in the Kings County action seems to me entirely consistent with their affidavits submitted in this action stating that they relied upon their son in all respects with regard to the events underlying this action, and were unaware of his fraudulent acts committed against his clients.

**3.** The complaint alleges that the Collateral Mortgage was assigned to plaintiff on October 30, 2009, as well. However, the exhibit attached to the complaint in support of this claim is the assignment of the Mortgage, not the Collateral Mortgage.

his own. He appeared at the mandatory settlement conference on August 20, 2014, where, according to plaintiff's counsel, he admitted that he and his parents had defaulted, and indicated that he intended to reach a settlement with Emigrant. However, Luigi failed to appear on the adjourned conference date or any subsequent court date.

On or about December 29, 2014, plaintiff filed a motion seeking entry of a default judgment and appointment of a referee. Neither Luigi nor anyone else acting on the senior Rosabiancas' behalf submitted opposition. However, plaintiff's motion for a default judgment was not decided at that time (and indeed, not until Apr. 11, 2016), because the judge presiding over this matter was transferred to the Kings County Supreme Court, and the matter had to be assigned to a new judge.[4]

When the senior Rosabiancas learned that their son had failed to do anything to prevent their home from being foreclosed upon, they retained counsel. On April 27, 2015, their attorney filed an order to show cause seeking to vacate their default in appearing, to permit them to file a late answer, to dismiss so much of the complaint as seeks to foreclose on their home, and to award them counsel fees pursuant to Real Property Law § 282. In their affidavits in support of the motion, the senior Rosabiancas pointed out that they never entered into an agreement with Emigrant Bank, and that, consistent with the limiting language in the powers of attorney, they "never authorized Luigi Rosabianca to enter into an agreement which placed a mortgage on [their] primary residence . . . [and they] never authorized Luigi Rosabianca to use [their] home as collateral in the purchase of the 55 Wall Street Property." They also explained that, "[a]fter [they] learned about this action, Luigi reassured [us] that he would do everything in his power to prevent our home from being foreclosed upon," and that they "did not know of Luigi's . . . legal troubles which he had caused for himself by stealing money from his clients." They further stated that, "[u]pon learning that [Luigi] did not do anything on our behalf," they retained counsel. When the senior Rosabiancas filed their motion for leave to file a late answer, plaintiff's motion for a default judgment was still pending, due to the change in the assigned justice.

On April 11, 2016, counsel appeared for oral argument. After hearing oral argument, the motion court denied the senior Rosabiancas' motion. A written order denying the motion was

---

4. Neither this motion nor the 2016 judgment is in the record on appeal.

entered on April 16, 2016, and the senior Rosabiancas now appeal.[5]

Analysis

I agree with the majority that the motion by the senior Rosabiancas for leave to file a late answer is governed by CPLR 3012 (d), which provides that, upon application, "the court may extend the time to appear or plead, or compel the acceptance of a pleading untimely served, upon such terms as may be just and upon a showing of reasonable excuse for delay or default." The determination of a CPLR 3012 (d) motion lies within the sound discretion of the court (*see Myers v City of New York*, 110 AD3d 652 [1st Dept 2013]). Here, the motion court abused its discretion by failing to treat the motion as a motion to permit the filing of a late answer under CPLR 3012 (d), and instead analyzing it as a motion "to vacate the default" under CPLR 5015.

The majority implicitly acknowledges that the motion court failed to consider the factors relevant to a motion to permit the filing of a late answer under CPLR 3012 (d) discussed in *Artcorp Inc. v Citirich Realty Corp.* (140 AD3d 417 [1st Dept 2016], *supra*), and *Guzetti v City of New York* (32 AD3d 234, 238 [1st Dept 2006] [McGuire, J., concurring]). In my view, consideration of these factors weighs in favor of granting the senior Rosabiancas' motion, particularly in view of our State's "strong public policy in favor of resolving cases on the merits," recognized by this Court in *Artcorp* (140 AD3d at 418). As Justice McGuire noted, quoting the sponsor's memorandum for the Senate bill that became CPLR 3012 (d), "[C]ourts must have broad discretion to regulate litigation in the interests of justice, while preserving adherence to reasonable requirements of diligence as essential to the administration of justice" (*Guzetti*, 32 AD3d at 239 n). Considering the absence of any prejudicial effect on either plaintiff or the court system in this case, and the potential for injustice in not extending the senior Rosabiancas' time to file an answer, I would find that the denial of their motion was an abuse of discretion. I address each factor below.

Delay

The factor of delay favors granting the motion here, since, as the majority concedes, there would be no prejudice to plaintiff

**5.** On April 11, 2016, the motion court directed the parties to settle an order granting plaintiff's motion for a default judgment. The Unified Court System website indicates that the settled order was signed on July 22, 2016. If this Court had decided in the senior Rosabiancas' favor on this appeal, that could have provided them a basis to seek renewal of plaintiff's motion for a default judgment.

in permitting the senior Rosabiancas to file a late answer. Moreover, the delay in this matter up to the time when this motion was decided was not attributable to either party, but to the court's need to assign a new judge, which did not occur for over a year.

Excuse for Delay

I strongly disagree with my colleagues that the excuse offered by the senior Rosabiancas is "questionable" and that this factor is "arguably neutral" in this case. Even a "less than compelling" excuse for delay may suffice on a CPLR 3012 (d) motion, since "there is a strong preference in our law that matters be decided on their merits in the absence of demonstrable prejudice" (*Elemery Corp. v 773 Assoc.*, 168 AD2d 246, 247 [1st Dept 1990]; *see also HSBC Bank USA v Lugo*, 127 AD3d 502, 503 [1st Dept 2015]). Here, it was entirely reasonable of the senior Rosabiancas to rely on the representation of an experienced real estate attorney, who is also their son, that he would take whatever steps were necessary on their behalf (*see D&R Global Selections, S.L. v Bodega Olegario Falcón Piñeiro*, 90 AD3d 403, 406 [1st Dept 2011] [defendant who failed to answer complaint or appear for 26 months in good faith reliance on incorrect advice of counsel demonstrated reasonable excuse]).

No one disputes that Luigi Rosabianca assured his parents that he would prevent the foreclosure of their property and that he then failed to file an answer or to make any appearances in this action except at the initial settlement conference. Where conduct such as this is the result of law office failure, a court may exercise its discretion to excuse the party's delay, because CPLR 2005 provides that "the court shall not, as a matter of law, be precluded from exercising its discretion in the interests of justice to excuse delay or default resulting from law office failure." This case provides an even stronger argument for the exercise of the court's discretion, because the senior Rosabiancas' delay in answering the complaint was not the result of their attorney's law office failure but rather the consequence of another instance of their son's now well documented history of defrauding clients, who, in this case, were his parents.

Willfulness

The majority would find that the delay by the senior Rosabiancas showed willfulness. In *Artcorp*, we declined to find willfulness where a party did not demonstrate an "inten[t] to abandon the case" (*Artcorp*, 140 AD3d at 418). The senior Rosabiancas' reasonable reliance on their son, who turned out to have stolen millions of dollars from his clients, and their

prompt retaining of counsel when they realized he had done nothing to protect them, indicates that their delay in filing an answer showed no intent to abandon their defenses, and was therefore not willful.

I would find that the motion court's failure to consider the reasonableness of the senior Rosabiancas' excuse, and the lack of willfulness on their part, was an abuse of discretion, since this is clearly a situation where the court had ample evidence that innocent and trusting parents had been swindled by their dishonest son. At the time of oral argument before the court on April 11, 2016, Luigi Rosabianca had been suspended from the practice of law (in Mar. 2015) for failure to cooperate with the Disciplinary Committee's investigation and for mishandling and misappropriating IOLA funds; he had been disbarred in July 2015 for continuing to practice law during his suspension; he had been indicted in October 2015 on charges that he stole $4.5 million from clients; and he was incarcerated.

Prejudice

I agree with my colleagues that consideration of any prejudice to plaintiff in permitting the senior Rosabiancas to file a late answer does not weigh against granting their motion. However, I disagree to the extent that the majority finds that consideration of this factor is somehow "neutral." Although the majority implies that plaintiff has argued that it would suffer prejudice due to "delay in recouping its interest in the property," plaintiff does not make this argument; it cites only to cases based on CPLR 5015, which does not require a showing of prejudice. Plaintiff also did not argue before the motion court that it would suffer any prejudice if the court permitted the senior Rosabiancas to file a late answer. Prejudice is the loss of "some special right . . . , some change of position or some significant trouble or expense that could have been avoided" (*Barbour v Hospital for Special Surgery*, 169 AD2d 385, 386 [1st Dept 1991] [internal quotation marks omitted]). The filing of the senior Rosabiancas' motion caused no prejudice to plaintiff by delay, since, at the time, the motion court was holding plaintiff's summary judgment motion in abeyance due to the transfer of the matter to a different justice.

Meritorious Defense

Where a motion for leave to file a late answer is made prior to entry of a default judgment, no showing of meritorious defense is required (*Hirsch*, 105 AD3d at 522). Indeed, in *Artcorp*, cited by the majority, we noted that demonstration of a meritorious defense is "not 'essential' " on such a motion (*Artcorp*, 140 AD3d at 418). This is consistent with Justice Mc-

Guire's concurrence in *Guzetti*, in which he quoted from the sponsor's memorandum: " 'while the merits of the applicant's case may sometimes be an appropriate factor for consideration, routine insistence on a showing of merits in cases of short delay would be an unwarranted burden' " (32 AD3d at 239 n [emphasis omitted]). Yet the majority finds that this is the "most notable" factor in affirming the motion court's denial of the senior Rosabiancas' motion.

In any event, the senior Rosabiancas have demonstrated at least one meritorious defense. The senior Rosabiancas' primary argument is that the Collateral Mortgage was ineffective to give plaintiff a security interest in their home because Luigi did not have authority to execute the Collateral Mortgage. Specifically, each power of attorney provides on its face that it is "created for the express, *limited* purpose of authorizing and empowering the agent to do any and all acts connected with the *refinance* of the residential property known as 2342 Benson Avenue" (emphasis added). This limiting language explicitly prohibited Luigi from exercising any of the initialed powers except in relation to a "refinance" of the senior Rosabiancas' residence, and thus vitiated the broad general language of the powers of attorney. According to Black's Law Dictionary (10th ed 2014, refinancing), a refinance is "[a]n exchange of an old debt for a new debt." Since it is undisputed that there was no mortgage on the senior Rosabiancas' home either at the time they executed the powers of attorney or when their son closed on the Collateral Mortgage approximately two weeks later, there was no debt to refinance, and there is no claim that there was any. The limiting language on the face of the powers of attorney should have put plaintiff's predecessor in interest on notice that Luigi Rosabianca did not have actual authority, and may not have had apparent authority, to execute the Collateral Mortgage.[6]

The majority states that the senior Rosabiancas "have not challenged the overall validity of the powers of attorney, nor have they questioned EMC's legal duty to honor them." This is inaccurate. In their affidavits, the senior Rosabiancas explicitly state that they "never authorized Luigi Rosabianca to use [our] home as collateral in the purchase of the 55 Wall Street Property." That statement is entirely consistent with the limiting

---

**6.** The majority's statement that the bank was not "required to look beyond the[ ] facial validity" of the powers of attorney fails to recognize that the limiting language appears on the face of each power of attorney. Accordingly, there was no need to look beyond the face of each document to determine that it limited Luigi's power to act.

language in the powers of attorney, as discussed above. The senior Rosabiancas' attorney argued in his affirmation in support of the motion, and in his brief to this Court, that Luigi "had no actual authority to use his parents' house as security to purchase his Manhattan condominium." Accordingly, the senior Rosabiancas very explicitly dispute that the powers of attorney gave Luigi authority to execute a mortgage on their home in order to secure a loan to enable him to purchase the Condominium.[7]

The majority states that there was nothing about the powers of attorney that would have put the bank on notice that "something was amiss" (*Oliveto Holdings, Inc. v Rattenni* (110 AD3d 969, 971 [2d Dept 2013] [internal quotation marks omitted]). However, I find that the limiting language appearing on the face of each power of attorney should have put the bank on notice. *Oliveto* is not comparable to the case at bar, since there is no indication that the power of attorney at issue in that case contained either additional limiting language or a limitation on gifts to the agent. Here, the mortgage transaction violated the express terms of the powers of attorney both because it was not a refinance of debt secured by the senior Rosabiancas' home and because it is undisputed that Luigi's use of the powers of attorney benefitted only himself.

Furthermore, *Oliveto* was decided after trial. As discussed further below, the Court of Appeals has held that where, as here, a bank invokes the doctrine of apparent authority to justify its actions, it has a duty to determine the extent of the agent's authority, and whether or not the bank did so is a question of fact. Thus, when faced with such a situation, the Court of Appeals reversed the Second Department and held that "it was error for the Appellate Division to hold, as a matter of law, that the bank was under no duty to investigate the circumstances surrounding the mortgage . . . [since that] issue, involving inferences to be drawn from evidentiary proof," should not be determined on a motion to dismiss (*Collision Plan Unlimited v Bankers Trust Co.*, 63 NY2d 827, 830 [1984]). Similarly, this case is not in an appropriate procedural position to make a finding as a matter of law on the issue of whether or not Luigi had apparent authority to act.

Even if the Collateral Mortgage taken on their unencumbered home to finance their son's purchase of a condominium for

---

7. For the same reason, my colleagues' statement that the Rosabiancas never raised the argument that Luigi lacked authority to act is not correct. The defense is present in each of the senior Rosabiancas' affidavits and in their attorney's affirmation.

himself could be seen as a "refinance," the majority fails to address the fact that each power of attorney restricts gifts made by the agent, including to himself, to no more than $10,000 per year. By imposing a mortgage on his parents' home as collateral for a $1.76 million dollar loan in order to purchase a condominium for himself, Luigi essentially made a gift to himself of all of the equity in his parents' home, which plaintiff claims had a value of $918,500 as of February 23, 2015. The General Obligations Law "unambiguously imposes a duty on the attorney-in-fact to exercise gift-giving authority in the best interest of the principal . . . [and] the purpose of the gift-giving authority is to allow an attorney-in-fact to carry out the principal's intentions to use gifts as part of a financial or estate plan" (*Matter of Ferrara*, 7 NY3d 244, 252-253 [2006]).[8] The Rosabiancas' son acted beyond his limited powers under the powers of attorney by giving himself a gift in excess of $10,000 in the form of a collateral mortgage on his parents' home to secure a debt of $1.76 million, and by doing so in a manner that was clearly not in their best interests as part of a financial or estate plan.

The majority concludes, without any analysis of the language of the powers of attorney, that Luigi Rosabianca had "not only apparent, but express authority," upon which plaintiff "reasonably relied." This conclusion is not consistent with Court of Appeals cases, all the more relevant here because the powers of attorney at issue were executed and used at the closing before the effective date of the 2008 amendments to the General Obligations Law. Those cases show that a party who deals with an agent has a duty to determine the extent of the agent's authority (*Ford v Unity Hosp.*, 32 NY2d 464, 472-473 [1973]) and that, where an agent has neither actual nor apparent authority, the principal is not liable to third parties (*Standard Funding Corp. v Lewitt*, 89 NY2d 546 [1997] [insurance company not bound by premium financing agreements entered into by one of its agents where the agency's contract only authorized the agent to issue policies and collect premiums]). The Court of Appeals has explained that "[t]he mere creation of an

---

8. As discussed further below, the General Obligations Law was amended in 2008, effective September 1, 2009. In *Ferrara*, the Court of Appeals addressed section 5-1502M (1) of the General Obligations Law, which, at the time, provided that gifts were to be made by an attorney-in-fact "in the best interest of the principal" (*Ferrara*, 7 NY3d at 251). That section was repealed by the 2008 amendment and replaced with a new section 5-1514, effective in 2009, which also provides that the gift-giving power must be exercised by the attorney-in-fact "in the best interest of the principal" (General Obligations Law § 5-1514 [5]).

agency for some purpose does not automatically invest the agent with 'apparent authority' to bind the principal without limitation. An agent's power to bind his principal is coextensive with the principal's grant of authority. One who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority. Upon failure to properly determine the scope of authority, and in the face of damages resulting from an agent's misrepresentations, 'apparent authority' is not automatically available to the injured third party to bind the principal. Rather, the existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentations of the agent because of some misleading conduct on the part of the principal—not the agent. As one treatise on New York law states: 'The very basis of the doctrine of apparent authority indicates that the principal can be held liable under the doctrine only where he was responsible for the appearance of authority in the agent to conduct the transaction in question. The apparent authority for which the principal may be held liable must be traceable to him; it cannot be established by the unauthorized acts, representations or conduct of the agent' " (*Ford*, 32 NY2d at 472-473 [citations omitted]).[9]

Here, plaintiff claims it is protected by the doctrine of apparent authority. However, it had a duty of reasonable inquiry into the scope of Luigi Rosabianca's authority (*id.*; *see also Collision Plan Unlimited*, 63 NY2d at 830; *1230 Park Assoc., LLC v Northern Source, LLC*, 48 AD3d 355, 356 [1st Dept 2008]). There is no claim that plaintiff or its predecessor undertook any inquiry, even to the extent of reading the powers of attorney with care, before the Mortgage closing.

The majority concludes that these common-law rules about agency do not apply to powers of attorney because the "applicable principles . . . have been statutorily codified." I disagree for two reasons. First, the powers of attorney at issue here were executed and used at the closing in April and May 2008, respectively. The amendments to the General Obligation Law, including those sections relied upon by the majority, were not effective until September 2009, and the amendment provides that it "shall apply to all powers of attorney executed *on or after the effective date of this act* and . . . shall not affect the validity of any power of attorney or the conveyance of authority

---

**9.** The majority attempts to distinguish *Ford* by pointing out that, in that case, it was undisputed that the agent was not authorized to act. However, that does not alter the legal principle articulated by the Court, which is applicable in this case.

to an attorney-in-fact or agent contained in a power of attorney executed prior to the effective date of this act if such power of attorney was valid at the time of its execution" (L 2008, ch 644, § 21 [emphasis added]). Second, in *Ferrara,* the Court of Appeals observed that, even after the legislature amended the General Obligations Law power of attorney provisions in 1996 so that the agent's duty to act in the principal's "best interest" appeared in some provisions but not others, reading the best interest requirement into a provision that did not contain those words "is consistent with the [common-law] fiduciary duties that courts have historically imposed on attorneys-in-fact" (7 NY2d at 254). Indeed, section 5-1504 of the General Obligations Law, as amended in 2008, prohibiting third parties from refusing to accept validly executed powers of attorney "without reasonable cause" merely incorporates the previously existing common-law principle that "a third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable" (*Hallock v State of New York,* 64 NY2d 224, 231 [1984]).

Furthermore, given the express limitation on the face of the powers of attorney here, I disagree with the majority's statement that plaintiff "reasonably" relied on them. I also disagree that *Parlato v Equitable Life Assur. Socy. of U.S.* (299 AD2d 108, 113 [1st Dept 2002], *lv denied* 99 NY2d 508 [2003]) imposes liability on the senior Rosabiancas. Despite having taken the position that "applicable principles regarding powers of attorney have been statutorily codified and supplant the general common-law doctrine," the majority cites *Parlato* for the proposition that a principal may be held liable in tort where its agent misuses its apparent authority to commit fraud to the detriment of the principal. There, the defendant, Equitable Life, had fired the plaintiff's insurance agent, but failed to notify his clients of the firing. For approximately four years following the firing, the ex-agent continued to hold himself out to the plaintiff as her Equitable Life agent, and ultimately stole her money. The Court of Appeals held that the plaintiff's claim against Equitable Life for the ex-agent's acts after his termination should not have been dismissed, because a third party is entitled to assume that the agent's authority continues until the third party receives notice that the principal has revoked the agent's authority.

In contrast, here, the powers of attorney did not give the agent, Luigi Rosabianca, actual authority to use the Rosabiancas' home as collateral for his purchase of a condominium for himself, and there is at least a question of fact as to whether

they gave him apparent authority to do so. Moreover, here, the principals were not a large financial service company, but the elderly immigrant parents of the agent, to whom the agent had a fiduciary duty (*Ferrara*, 7 NY3d 244, 254-255 [" '(A) power of attorney . . . is clearly given with the intent that the attorney-in-fact will utilize that power for the benefit of the principal' "]).[10]

Nor is it clear as a matter of law that plaintiff's conduct is justified by General Obligations Law § 5-1504. The current version of the statute, in pertinent part, bars a third person from "refus[ing], without reasonable cause, to honor a statutory short form power of attorney" (General Obligations Law § 5-1504 [1]). In May 2008, however, section 5-1504 provided only that "[n]o financial institution located in this state shall refuse to honor a statutory short form power of attorney" (L 1996, ch 499, § 5). In my view, neither version of the statute permits a person to honor a power of attorney for any purpose other than that explicitly stated. Certainly, the bank would have violated the statute if it had refused to permit Luigi to execute documents "connected with the refinance of the [Brooklyn residence]." Plaintiff's claim that it can rely on the powers of attorney for any other purpose raises at the very least a question of fact, which cannot be resolved in the procedural posture of this case.

In addition, as the senior Rosabiancas' attorney argued before the motion court, "There may also be further defenses that come up once discovery is complete." One potential defense is the facial inadequacy of the foreclosure claim against the Brooklyn residence, based on the documents attached to the senior Rosabiancas' motion papers. The third cause of action in the complaint seeks foreclosure on the Brooklyn residence. The claim, which is based solely on the Collateral Mortgage, asserts that the plaintiff is entitled to foreclose the Collateral Mortgage because Luigi defaulted under the Note. However, the Collateral Mortgage does not secure the Note executed by Luigi. Rather, the Collateral Mortgage, on its face, provides security only for a note executed by the senior Rosabiancas. However, no one has produced such a note. The senior Rosabiancas explicitly deny signing any agreement with plaintiff. Moreover, the record does not contain any note executed by the senior Rosabiancas, either in their own capacity or by power of attorney, and no one claims that such a note exists.

The majority seeks to excuse this obvious gap by stating that

---

**10.** This principle was codified at General Obligations Law § 5-1501 (2) (a), as a result of the 2008 amendment (L 2008, ch 644, § 2).

the Collateral Mortgage "was clearly intended to secure the Rosabiancas' home and to refer to the adjustable rate note signed by Luigi." However, we do not have authority to rewrite the Collateral Mortgage. If plaintiff believes the Collateral Mortgage contains an error, its remedy is to seek reformation of the Collateral Mortgage. Were plaintiff to do so, it would be required "to proffer evidence, which, in no uncertain terms, evinces fraud or mistake and the intended agreement between the parties" (*US Bank N.A. v Lieberman*, 98 AD3d 422, 424 [1st Dept 2012]). The senior Rosabiancas dispute that they authorized Luigi to encumber their home, and certainly dispute that they are parties to that transaction. Accordingly, the identity of the intended borrower or borrowers under the Collateral Mortgage, as well as the parties' intent, are issues of fact that are not clarified by the record on this appeal. Therefore, the senior Rosabiancas' defense that the complaint fails to state any claim against them or their home may be meritorious.

Accordingly, I would find that the motion court abused its discretion by failing to consider the appropriate factors in determining the senior Rosabiancas' CPLR 3012 (d) motion for permission to file a late answer. I would further find that consideration of all five of the factors discussed in the concurrence in *Guzetti*, as well as our "strong public policy in favor of resolving cases on the merits" (*Artcorp*, 140 AD3d at 418), support granting the motion. Therefore, I would find that they should be permitted to interpose an answer.